**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CAPITALKEYS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-2079 (KBJ) |
| | ) | |
| DEMOCRATIC REPUBLIC OF | ) | |
| CONGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

Plaintiff CapitalKeys, LLC ("CapitalKeys"), a Washington, D.C.-based lobbying

firm, alleges that it executed a contract in which the firm agreed to provide five years of

unspecified "government relations and strategic communications services" to the

Democratic Republic of the Congo ("the Congo") and the Central Bank of the

Democratic Republic of the Congo ("the Central Bank," and, collectively,

"Defendants") in exchange for $16.6 million.  (Compl., ECF No. 4, ¶¶ 15–16.)  The

terms of the six-page retainer agreement—which the outgoing Governor of the Central

Bank allegedly executed on April 18, 2013, while in CapitalKeys's D.C. offices—

required the Central Bank to pay the entire five-year service contract price to

CapitalKeys upfront and upon the contract's signing.  (*See id.* ¶¶ 14–17.)[1]  CapitalKeys

maintains that the total fee was *not* paid when the agreement was signed, however, such

---

[1] According to CapitalKeys, the Congo made a "good faith payment" of $600,000 toward the contract price in March of 2013, approximately one month prior to the contract's execution.  (Compl. ¶ 13.) The subsequent written agreement specified that the total service fee was "payable in one payment of $16,602,000 due upon signing."  (App. A at A-4.)

that Defendants breached the agreement from the outset.  (*See id.* ¶ 18.)  Yet,

CapitalKeys allegedly commenced working for the benefit of the Congo and the Central

Bank pursuant to the contract nonetheless, in light of the Congo's oral promise to pay,

and for the next five years the firm purportedly "counsel[ed] Congolese officials on . . .

how to work with" international organizations and "assist[ed] the Central Bank in

modernizing their internal infrastructure[,]" among other things, without any payment

from Defendants at all.  (*Id.* ¶¶ 19, 22, 27, 39.)  In the complaint that CapitalKeys filed

in this Court two years into the five-year service contract period, the firm maintains that

Defendants now owe more than $16.2 million, representing the unpaid portion of the

contract price plus interest.  (*See id.* ¶¶ 49, 58; *see also* Pl.'s Mot. to Modify Default J.,

ECF No. 50, at 1.)[2]

   Before this Court at present is a motion that the only defendant to have entered

an appearance in this legal action after a prior default—the Central Bank—has filed,

seeking dismissal of CapitalKeys's complaint under Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6).  (*See* Def.'s Mot. to Dismiss ("Def.'s Mot."), ECF No. 63.)  The

Central Bank asserts that the outgoing Governor was not actually authorized to enter

into any service contract on behalf of the Central Bank, much less one that required the

Central Bank to pay CapitalKeys millions of dollars (*see id.* at 11, 17; *see also* Mot. to

Dismiss Hr'g Tr., ECF No. 75, at 31:8–18), and that, in any event, CapitalKeys did not

actually perform any services pursuant to that alleged agreement or otherwise (*see*

Def.'s Mot. at 12, 17).  Moreover, as a threshold matter, the Central Bank's motion

contends that the Central Bank has sovereign immunity from suit as an agency of the

---

[2] Page number citations to the documents that the parties and the Court have filed refer to the page
numbers that the Court's electronic filing system automatically assigns.

Congo, and that, as a result, this Court lacks subject-matter jurisdiction over CapitalKeys's claims against the Central Bank under the Foreign Sovereign Immunities Act ("FSIA"). (*See id.* at 14.)

For the reasons explained fully below, this Court agrees that the Central Bank has sovereign immunity, because neither of the identified statutory exceptions to foreign sovereign immunity applies with respect to CapitalKeys's claims against the Central Bank. Moreover, and for that same reason, the Court likewise concludes that it lacks subject-matter jurisdiction over CapitalKeys's claims against the Congo itself. Therefore, the Central Bank's motion to dismiss CapitalKeys's complaint must be **GRANTED**, and CapitalKeys's complaint will be **DISMISSED** in its entirety. A separate Order consistent with this Memorandum Opinion will follow.

## I.    BACKGROUND

### A.    Factual Background[3]

CapitalKeys is a lobbying and public affairs company based in the District of Columbia. (*See* Compl. ¶ 5.) According to CapitalKeys's complaint, in February of 2013, "[a]fter six (6) months of protracted negotiations, . . . the Central Bank, acting as an agent for the Congo, entered into an oral agreement to retain the services of CapitalKeys[,]" and the following month, "in March of 2013, the Congo made a good faith payment of $600,000 as consideration" for that agreement. (*Id.* ¶¶ 12–13; *see also* Ex. B to Compl., ECF No. 4-3, at 2.) Then, on April 18, 2013, CapitalKeys allegedly executed a written service contract with the Central Bank and the Congo aimed at

---

[3] Unless otherwise noted, the following allegations of fact are drawn from CapitalKeys's complaint and the attached exhibits.

improving the Congo's image abroad and bolstering the Congo's economy over a five-year period.  (*See* Compl. ¶¶ 14–17.)

Under the "Retainer Agreement" (which was filed as an exhibit to CapitalKeys's complaint and is attached to this Memorandum Opinion as Appendix A), CapitalKeys agrees to provide the Central Bank with "government relations and strategic communications services" (App. A at A-2), and to do so over a five-year timeframe, starting in November of 2013, and extending through November of 2018 (*id.* at A-4). CapitalKeys specifically promises to "[a]ssist [the] Central Bank in strategies to reduce inflation and stabilize the currency" (*id.* at A-2); to "[a]dvise [the] Central Bank on the creation of a new stock market for a stronger economy" (*id.*); and to "[a]ssist the Central Bank to modernize its internal infrastructure" (*id.* at A-3).  The agreement also provides that CapitalKeys will help "[s]trengthen the Central Bank's relations, creditability, and integrity with financial institutions, global asset managers, private equity, NGO's, and decision makers"; will "[w]ork with the media to redefine the image of the Central Bank and present this redefined good image around the globe"; and will "[c]reate an 'echo chamber' with specific emphasis on agencies such as the World Bank and IMF to raise issues critical to the Central Bank."  (*Id.* at A-2–A-3.)  Furthermore, "at no additional cost[,]" CapitalKeys promises to introduce the Central Bank's Governor to "high level persons in certain foreign governments[,]" thereby purportedly assisting the Central Bank with "[g]eneral [r]elationship [b]uilding[,]" and the firm also commits to "supplying strategy resulting from many years of domestic and international advising."  (*Id.* at A-3–A-4.)[4]

---

[4] In this regard, the Retainer Agreement further asserts that, with the introductions that CapitalKeys is promising to facilitate, the Central Bank "potentially may find dealing with the CEO, Executive Vice

With respect to the fee payments that are due in exchange for CapitalKeys's myriad services, the Retainer Agreement states:

> 4.  <u>Fee Amount, Expenses and Payment Schedule</u>.  Client agrees to pay [CapitalKeys] $276,700 per month for professional services (the "Retainer Fees") for a total of $3,320,400 per year which is $16,602,000 for 5 years payable in one payment of $16,602,000 due upon signing.

(*Id.* at A-4.)  Under the terms of the agreement, this day-one lump-sum payment was to be sent to CapitalKeys "by bank wire" and directed to a delineated Wells Fargo Bank account.  (*Id.*)  And the agreement specifically anticipates the consequences if such payment is not made timely and in the indicated fashion.  Indeed, immediately after the payment provision quoted above, the contract states that "[f]ailure by Client to pay subsequent professional service and expense fees, if required by this agreement and according to the schedule outlined above, will result in suspension of work[.]"  (*Id.*)  And the agreement later suggests that CapitalKeys would take legal action to enforce the contract terms if necessary, by specifying that "[t]his Agreement will be governed by the laws of the District of Columbia without regard to principles of conflicts of law and a court in said place shall be the exclusive location for any suit or proceeding relating to this Agreement."  (*Id.* at A-6.)

It is significant for present purposes that the Retainer Agreement just described and attached hereto appears to have been signed by only two individuals: the President of CapitalKeys, Adam Falkoff, and Jean-Claude Masangu Mulongo, who was the

_____

President, etc., of some major companies here and overseas, may result in major deals, solutions, or contracts[,]" and that the Central Bank "may find that having the reference of [CapitalKeys] and [its] Washington D.C. office presence" will "strengthen [the Central Bank's] credibility in dealing and relationships here and abroad[.]"  (App. A at A-3–A-4.)  Notably, however, the terms of the agreement also restrict the Central Bank's ability to use CapitalKeys's name freely, or to tout the consulting relationship that the contract establishes, by specifying that "[n]o public release or communication" naming CapitalKeys "may be undertaken without [CapitalKeys's] prior review and approval."  (*Id.* at A-5.)

outgoing Governor of the Central Bank. (*See* Compl. ¶ 17; App. A at A-1, A-6.)[5]  In the complaint, CapitalKeys alleges that, while it was Governor Masangu who executed the agreement on behalf of the Central Bank, "all parties understood that the Central Bank was acting as the agent and alter ego of Congo and that Congo would be bound by the agreement." (Compl. ¶ 14.)  The complaint also maintains that, rather than tendering the "the remaining agreed upon payment of $16,002,000" (representing the contract price minus the previous $600,000 good-faith payment) at the time of signing, Governor Masangu signed the agreement with an accompanying oral promise "that payment would be made shortly." (*Id.* ¶ 18.)

CapitalKeys alleges that, rather than cancelling the agreement pursuant to the express terms of the contract as a result of Defendants' failure to pay, the firm accepted the Congo's oral promise that payment would be forthcoming and "commenced providing their services to" the Central Bank and the Congo. (*Id.* ¶ 19.)  Moreover, according to CapitalKeys, unidentified Congo representatives repeatedly made additional promises to pay in the years that followed (*see, e.g.*, *id.* ¶¶ 23, 25–26, 31, 33–34, 38), but neither the Congo nor the Central Bank paid any of the remainder of the contract price (*see id.* ¶ 38).  Nevertheless, CapitalKeys allegedly continued to fulfill its end of the bargain, by rendering the agreed-upon aid to the Central Bank and the Congo

---

[5] According to the Central Bank, Governor Masangu's term as Governor of the Central Bank was set to expire on May 14, 2013, less than one month after the date on which he signed the Retainer Agreement. (*See* Ex. 2 to Def.'s Reply ("Nyembo Decl."), ECF No. 67-2, ¶ 2.)  CapitalKeys neither disputes nor relies upon this fact when addressing the Central Bank's contention that Governor Masangu was not authorized to enter into the agreement with CapitalKeys.

nonetheless, in reliance on what CapitalKeys describes as the Congo's repeated (and presumably oral) promises to pay. (*See, e.g.*, *id.* ¶¶ 24, 27, 39.)[6]

CapitalKeys's complaint also includes various allegations regarding the services that CapitalKeys purportedly provided to the Central Bank and the Congo pursuant to the Retainer Agreement between 2013 and 2018 (*i.e.*, during the lengthy period of Defendants' alleged non-compliance). For instance, the complaint states that "[o]ne month after the parties signed the Retainer Agreement, the International Monetary Fund ('IMF') canceled all cash disbursements to Congo, claiming that Congo failed to publish sufficient detail on the sale of a state-owned copper mine." (*Id.* ¶ 20.) Yet, "[a]s a result of CapitalKeys' relationships and expertise," CapitalKeys was "able to counsel Congolese officials on exactly how to work with the IMF to solve the issues, resulting in a disbursement of $225,000,000 to the Congo." (*Id.* ¶ 22.) Similarly, according to the complaint, "in 2014, CapitalKeys was able to impart critical strategies for [the] Congo to use when negotiating with the United States Agency for International Development ('USAID'), resulting in approximately $127,000,000 in humanitarian aid being sent to the Congo." (*Id.* ¶ 28.) CapitalKeys also alleges—without elaboration or explanation—that it helped to "elevat[e] the global image of the Congo" (*id.* ¶ 27); that it "assist[ed] the Central Bank in modernizing their internal infrastructure" (*id.*); and that it also "connect[ed] the Congo with high-powered individuals in other foreign governments and institutional leaders" (*id.* ¶ 29).[7]

---

[6] To date, CapitalKeys has not provided any contemporary documentary evidence, outside of what is stated in the contract, to support its assertion that the Central Bank or the Congo made promises to pay the contract fee after the execution of that agreement.

[7] CapitalKeys has not provided any contemporary documentary evidence that details or documents any of the services that the firm allegedly provided to Defendants pursuant to the Retainer Agreement.

### B.   Procedural History

On December 1, 2015, approximately two years into the alleged five-year contract term, CapitalKeys filed the instant four-count complaint against the Central Bank and the Congo, asserting claims against both Defendants for breach of contract (*id.* ¶¶ 42–49), unjust enrichment (*id.* ¶¶ 50–58), loss of business opportunities (*id.* ¶¶ 59–64), and "account stated" (*id.* ¶¶ 65–71).  With respect to these claims, CapitalKeys sought more than $23 million in monetary damages.  (*Id.*, Relief Requested.)  CapitalKeys served process on the Central Bank and the Congo in February of 2016 (*see* Proof of Service, ECF Nos. 18, 19), but the Central Bank and the Congo failed to enter an appearance or respond to the complaint in any respect. Consequently, on April 14, 2016, the Clerk of this Court declared that Defendants were in default.  (*See* Entry of Default, ECF Nos. 22, 23.)

Less than two weeks later, CapitalKeys filed a motion for a default judgment in the amount of $21,618,000, in addition to prejudgment interest and costs.  (*See* Pl.'s Mot. for Default J., ECF No. 24, at 1.)  This Court referred CapitalKeys's motion to a magistrate judge for a report and recommendation (*see* Min. Order of June 14, 2016), and on September 16, 2016, Magistrate Judge Kay held an evidentiary hearing at which Falkoff testified about CapitalKeys's alleged performance under the Retainer Agreement and the damages that CapitalKeys purportedly sustained as a result of Defendants' breach of the contract.  (*See* Mot. for Default J. Evid. Hr'g Tr., ECF No. 26.)  The report and recommendation that Magistrate Judge Kay issued on November 21, 2016, concluded, among other things, that Defendants were not entitled to sovereign immunity under the FSIA, *CapitalKeys, LLC v. Democratic Republic of Congo*, 278 F. Supp. 3d 265, 282–83 (D.D.C. 2017); that they were liable for breach of contract, *id.* at

285–86; and that CapitalKeys should be awarded $16,002,000 in compensatory damages, $881,207.45 in prejudgment interest, and $827.60 in costs, totaling $16,884,035.05, *id.* at 293.[8]

On October 6, 2017, after another hearing and supplemental briefing regarding several aspects of CapitalKeys's claimed damages, this Court adopted in part Magistrate Judge Kay's report and recommendation and granted in part CapitalKeys's motion for a default judgment. *Id.* at 277. Based on the uncontested facts in the record as it existed at that time, the Court "agree[d] with the Magistrate Judge that this Court has . . . subject matter jurisdiction over this case[,]" *id.* at 271, but disagreed with Magistrate Judge Kay's recommendation regarding the amount of damages and prejudgment interest, *see id.* at 272. For instance, the Court determined that "the proper measure of CapitalKeys's damages" at that point was $12,671,598.80, rather than $16,002,000, because the service period had not yet expired; the former figure represented the unpaid portion of the service contract price as of the date of the Court's judgment minus CapitalKeys's remaining alleged costs to complete its performance. *Id.* at 274. Thus, this Court entered a default judgment in the amount of $12,919,554.66. (Order, ECF No. 35, at 1.)[9] The Court also stated that it would "retain jurisdiction of this case during the pendency of the five-year contract period, which will end on November 17, 2018[,]" and that CapitalKeys could seek to recover the remainder of its damages at that time. (*Id.* at 1–2.) The Court further noted that, "[o]n or before

---

[8] Magistrate Judge Kay rejected CapitalKeys's contention that it was entitled to $5,016,000 in damages for lost business opportunities, and thus declined to award CapitalKeys the full $21,618,000 in compensatory damages that it sought. *CapitalKeys*, 278 F. Supp. 3d at 288.

[9] This figure represented $12,671,598.80 in compensatory damages to date, plus $247,128.26 in prejudgment interest and $827.60 in costs. *CapitalKeys*, 278 F. Supp. 3d at 277.

December 17, 2018, any party may move for an order modifying or setting aside this default judgment for good cause pursuant to Federal Rule of Civil Procedure 55(c)." (*Id.* at 1.)

The Central Bank and the Congo were each served with this Court's default judgment on February 26, 2018.  (*See* Affidavits of Service, ECF Nos. 44, 45.) Approximately ten months later, on December 13, 2018, counsel for the Central Bank (but not the Congo) entered an appearance in this matter (*see* Notice of Appearance, ECF No. 48), and filed a motion to set aside the default judgment under Rule 55(c) (*see* Def.'s Mot. to Set Aside Entry of Default J., ECF No. 55).  The Central Bank contended that it had meritorious defenses to CapitalKeys's claims, and it attached the motion to dismiss that it intended to file if the default judgment were set aside.  (*See* Ex. 1 to Def.'s Mot. to Set Aside, ECF No. 55-3.)  The Central Bank also argued that CapitalKeys would not be prejudiced if the default judgment were set aside and litigation proceeded with respect to its motion to dismiss the complaint, and that the Central Bank's default was not willful, but had instead been caused by "internal confusion regarding how the litigation would be handled and by whom."  (Def.'s Mem. in Supp. of Mot. to Set Aside, ECF No. 55-2, at 18–19.)  This Court granted the Central Bank's motion to set aside the default judgment on February 14, 2020 (*see* Mem. Op. & Order ("Order Setting Aside Default J."), ECF No. 62, at 8), and directed the Clerk of Court to docket the Central Bank's motion to dismiss separately (*see id.*), which was accomplished by order of the Court on February 14, 2020 (*see* Def.'s Mot.).

In the motion to dismiss, the Central Bank primarily seeks dismissal of the instant lawsuit for lack of subject-matter jurisdiction under Rule 12(b)(1), arguing that

neither of the exceptions to foreign sovereign immunity invoked in CapitalKeys's complaint applies with respect to the Central Bank.  (*See id.* at 15 (citing Compl. ¶ 9).)  In particular, the Central Bank argues that the FSIA's waiver exception, 28 U.S.C. § 1605(a)(1), is inapplicable, because the Retainer Agreement was "invalid and unlawful" under Congolese law, and because Governor Masangu "acted *ultra vires* in purporting to enter the contract with CapitalKeys."  (*Id.* at 15–16.)[10]  The Central Bank also maintains that the commercial-activity exception of the FSIA, 28 U.S.C. § 1605(a)(2), does not apply, because "CapitalKeys has not alleged—let alone submitted any evidence of—commercial activity carried on by the [Central] Bank in the United States."  (Def.'s Reply in Supp. of Mot. to Dismiss ("Def.'s Reply"), ECF No. 67, at 15; *see also* Def.'s Mot. at 17 n.4.)  In the alternative, the Central Bank asserts that CapitalKeys's complaint should be dismissed under Rule 12(b)(6), because CapitalKeys's allegations do not state a viable claim for relief.  (*See* Def.'s Mot. at 17–19.)

In its opposition brief, CapitalKeys points to the Retainer Agreement's choice-of-law clause and maintains that it constitutes an implicit waiver of the Central Bank's sovereign immunity under the FSIA.  (*See* Pl.'s Opp'n to Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 66, at 10.)  CapitalKeys further insists that Governor Masangu possessed both actual and apparent authority to enter into the Retainer Agreement on behalf of the Central Bank.  (*See id.* at 11, 14.)  And CapitalKeys asserts, in passing, that "[a]uthorized representatives from the Congo traveled to [CapitalKeys's] office in

---

[10] The Central Bank has submitted supporting declarations from Valentin Ramazani, the head of the Central Bank's Legal Department, and Deogratias Mutombo Mwana Nyembo, the current Governor of the Central Bank.  (*See* Ex. 1 to Def.'s Reply ("Ramazani Decl."), ECF No. 67-1, ¶ 3; Nyembo Decl. ¶ 5.)

11

Washington, D.C. to formalize the parties' agreement in writing" and that "[t]he contract was both executed and performed within the United States[,]" and thus the FSIA's commercial-activity exception applies.  (*Id.* at 11 (internal quotation marks and citation omitted).)  Finally, CapitalKeys maintains that the complaint contains legally sufficient allegations with respect to its claims for breach of contract, unjust enrichment, and account stated (*see id.* at 14–16; *see also id.* at 16 n.1 (conceding that "lost business opportunities are a potential element of damages and not a separate cause of action")), and argues that, if all else fails, CapitalKeys should be "permitted to conduct limited jurisdictional discovery related to the Central Bank's claim of sovereign immunity" (*id.* at 17).

This Court held a hearing on the Central Bank's motion to dismiss on February 19, 2021 (*see* Min. Entry of Feb. 19, 2021), and the motion is now ripe for decision.

## II.   STATUTORY FRAMEWORK AND LEGAL STANDARDS

### A.   The Foreign Sovereign Immunities Act

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country[.]"  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983) (observing that the FSIA establishes "a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies or instrumentalities").  The statute defines a "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  Moreover, under the FSIA, "foreign nations are presumptively immune from the jurisdiction of United States

courts" unless one of "several specific exceptions" laid out in that statute applies. *Fed. Republic of Ger. v. Philipp*, 141 S. Ct. 703, 707 (2021); *see also* 28 U.S.C. § 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."). This means that "a district court has subject matter jurisdiction over a suit against a foreign state if—and only if—the plaintiff's claim falls within a statutorily enumerated exception." *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34 (D.C. Cir. 2014).

The FSIA's "waiver" and "commercial activity" exceptions are the two bases upon which CapitalKeys relies in seeking to advance the claims it has brought against the Congo and the Central Bank in this case. (Compl. ¶ 9 (citing 28 U.S.C. § 1605(a)(1)–(2)).) The FSIA's "waiver" exception provides, in relevant part, that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the foreign state has waived its immunity either explicitly or by implication[.]" 28 U.S.C. § 1605(a)(1). The statute "does not define an implied waiver[,]" but "implicit in § 1605(a)(1) is the requirement that the foreign state have *intended* to waive its sovereign immunity." *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999) (emphasis added).[11] And in addition to having the intent to waive its sovereign immunity, the statute requires that the foreign state *itself* effect the waiver, in the sense that any waiver must be authorized by the foreign state; if "the foreign state has not empowered its agent to act, the agent's

---

[11] The "intentionality requirement" is "reflected in the examples of implied waiver set forth in the legislative history of § 1605(a)(1), all of which arise either from the foreign state's agreement (to arbitration or to a particular choice of law) or from its filing a responsive pleading without raising the defense of sovereign immunity." *Princz v. Fed. Republic of Ger.*, 26 F.3d 1166, 1174 (D.C. Cir. 1994) (citing H.R. Rep. No. 94-1487, at 18 (1976)).

unauthorized act [of waiver] cannot be attributed to the foreign state[.]" *SACE S.p.A. v. Republic of Para.*, 243 F. Supp. 3d 21, 35 (D.D.C. 2017) (quoting *Phaneuf v. Republic of Indon.*, 106 F.3d 302, 308 (9th Cir. 1997)). Thus, to trigger the FSIA's waiver exception, "the waiver of sovereign immunity must have been made by someone who has, or at the very least appears to have, the authority to act on behalf of the foreign sovereign with respect to such a waiver." *Id.* at 32.

The FSIA's "commercial activity" exception is yet another basis for exercising jurisdiction over a foreign state despite sovereign immunity. In this regard, the FSIA provides that

> [a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2). This exception reflects the "restrictive theory of foreign sovereign immunity[,]" under which "immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Verlinden*, 461 U.S. at 487; *see also Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) ("[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA.").

As relevant here, with respect to the first clause of the commercial-activity exception, the FSIA further clarifies that a "commercial activity carried on in the United States by a foreign state" refers to "commercial activity carried on by such state

14

*and having substantial contact with the United States*."  28 U.S.C. § 1603(e) (emphasis added).  The FSIA offers no further guidance about the meaning of the second and third clauses, but all three prongs of the commercial-activity exception require that the commercial conduct or its impact be substantially connected to the United States.  *See Verlinden*, 461 U.S. at 490 (noting that the FSIA's "substantive provisions requir[e] some form of substantial contact with the United States" in order to "protect[] against th[e] danger" that "our courts might be turned into small international courts of claims, open to all comers to litigate any dispute which any private party may have with a foreign state anywhere in the world" (internal quotation marks, citation, and alterations omitted)).

Like the FSIA's other enumerated exceptions, the waiver and commercial-activity exceptions to foreign states' sovereign immunity are "narrowly drawn[,]" *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012), and "should be construed as such[,]" *Azima v. RAK Inv. Auth.*, 305 F. Supp. 3d 149, 159 (D.D.C. 2018), *rev'd on other grounds*, 926 F.3d 870 (D.C. Cir. 2019); *see also, e.g.*, *Creighton*, 181 F.3d at 122 (observing that the D.C. Circuit has "followed the 'virtually unanimous' precedents construing the [FSIA's] implied waiver provision narrowly" (citation omitted)).  And "the FSIA's presumption of immunity serves to cut off litigation against foreign states at the earliest possible moment[,]" *Azima*, 305 F. Supp. 3d at 158, both because United States courts must "respect the independence and dignity" of foreign states, *Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017) (internal quotation marks and citation omitted), and because "defer[ring] the question" of sovereign immunity would

"frustrate the significance and benefit of entitlement to immunity from suit[,]" *Phoenix Consulting Inc. v. Republic of Angl.*, 216 F.3d 36, 39 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

### B.   Motions To Dismiss For Lack Of Subject-Matter Jurisdiction Under The FSIA

A motion to dismiss for lack of subject-matter jurisdiction in a case that implicates the FSIA is governed by a "nuanced" legal standard. *SACE*, 243 F. Supp. 3d at 32. "By moving to dismiss, the defendant may challenge either the legal sufficiency" of the allegations on the face of the complaint "or the factual underpinning of [the] exception" upon which the plaintiff relies. *Phoenix Consulting*, 216 F.3d at 40. And in this regard, "[a] facial challenge attacks the factual allegations of the complaint that are contained on the face of the complaint, while a factual challenge is addressed to the underlying facts" pertaining to the allegedly applicable FSIA exception. *SACE*, 243 F. Supp. 3d at 32 (internal quotation marks and citation omitted).

Consequently, the appropriate standard for evaluating such a motion to dismiss "depends upon whether the motion presents a factual challenge" or a facial challenge. *Phoenix Consulting*, 216 F.3d at 40. When a defendant brings a facial challenge, the court applies a standard "similar to that of Rule 12(b)(6)," *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002), in that "the court must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party[,]" *SACE*, 243 F. Supp. 3d at 32–33 (internal quotation marks and citation omitted). And the court is permitted to consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's

16

complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss[.]" *Azima*, 305 F. Supp. 3d at 159 (internal quotation marks and citation omitted).  To withstand such a facial challenge to subject-matter jurisdiction, the complaint's allegations, accepted as true, "must show that the defendant's conduct falls within the ambit of at least one of the FSIA's exceptions to sovereign immunity." *Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16, 21 n.8 (D.D.C. 2007).

By contrast, when a defendant brings a factual challenge to the complaint, the court evaluates the motion using a standard that "more closely resembles a motion to dismiss brought under Rule 12(b)(1)." *Azima*, 305 F. Supp. 3d at 159.  Under that standard, the court "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss[.]" *Phoenix Consulting*, 216 F.3d at 40.  Further, "factual challenges relating to the FSIA employ a burden-shifting framework for determining whether or not an FSIA exception applies[.]" *Azima*, 305 F. Supp. 3d at 159.  The plaintiff seeking to invoke the court's subject-matter jurisdiction "bears the initial burden to overcome" the FSIA's presumption of immunity "by producing evidence that an exception applies[.]" *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  However, once the plaintiff has met that initial burden of production, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply[.]" *Id.*

## C.    Determinations Of Foreign Law

Finally, the allegations in CapitalKeys's complaint and the arguments made in the Central Bank's motion implicate certain legal standards that pertain to a federal

17

court's consideration and application of foreign law.  Rule 44.1 of the Federal Rules of Civil Procedure provides that a United States federal court's determinations regarding the law of another country "must be treated as a ruling on a question of law" rather than as a factual issue.  Fed. R. Civ. P. 44.1.  And "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  *Id.*

Notably, when a federal court undertakes to decide a question of foreign law pursuant to Rule 44.1, "and the foreign government whose law is in contention submits an official statement on the meaning and interpretation of its domestic law," the court "should accord respectful consideration to [the] foreign government's submission, but is not bound to accord conclusive effect to the foreign government's statements." *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1869 (2018). Moreover, "the appropriate weight in each case will depend upon the circumstances[.]" *Id.* at 1873.  For instance, "[w]hen a foreign government makes conflicting statements or . . . offers an account in the context of litigation, there may be cause for caution in evaluating the foreign government's submission." *Id.* (citation omitted).  Other "[r]elevant considerations include the statement's clarity, thoroughness, and support; its context and purpose; the transparency of the foreign legal system; the role and authority of the entity or official offering the statement; and the statement's consistency with the foreign government's past positions." *Id.* at 1873–74.

## III.   ANALYSIS

At this stage of the instant case, the parties are primarily engaged in a vigorous debate over whether the Central Bank is immune from suit under the FSIA; CapitalKeys

and the Central Bank disagree, in particular, over whether the FSIA's waiver and commercial-activity exceptions apply.  *See* 28 U.S.C. § 1605(a)(1)–(2).  With respect to the waiver exception, this Court construes the Central Bank's motion as raising a *facial* challenge to the allegations in CapitalKeys's complaint: the Central Bank argues that, even if accepted as true, CapitalKeys's assertions do not establish that Governor Masangu had actual authority to enter into the Retainer Agreement on behalf of the Central Bank, and, therefore, his alleged assent to the agreement is not properly construed as a waiver of the Central Bank's sovereign immunity.  (*See* Def.'s Mot. at 14–17; Def.'s Reply at 11–15.)  The Central Bank also seems to be asserting a *factual* challenge to CapitalKeys's breach-of-contract claim and related claims, to the extent that it argues, with respect to the commercial-activity exception, that CapitalKeys has failed to produce any evidence that connects the alleged performances under the Retainer Agreement to the United States for purposes of that exception to the FSIA. (*See* Def.'s Mot. at 16–17 & n.4; Def.'s Reply at 6, 15–17.)

For the reasons explained below, this Court concludes that neither the waiver exception nor the commercial-activity exception is applicable to CapitalKeys's complaint, and as a result, CapitalKeys's legal action must be dismissed in its entirety for lack for subject-matter jurisdiction.

### A.   The Central Bank Has Not Waived Its Sovereign Immunity Because Governor Masangu Lacked Actual Authority To Bind The Central Bank To The Retainer Agreement

The primary arrow in CapitalKeys's FSIA quiver with respect to the Central Bank's assertion of sovereign immunity is a clause in the Retainer Agreement that plainly operates as a choice-of-law provision and a forum selection clause; according to CapitalKeys, that particular provision also qualifies as an implicit waiver of sovereign

19

immunity for section 1605(a)(1) purposes.  (*See* Pl.'s Opp'n at 10.)  The relevant sentence states: "[t]his Agreement will be governed by the laws of the District of Columbia without regard to principles of conflicts of law and a court in said place shall be the exclusive location for any suit or proceeding relating to this Agreement." (App. A at A-6.)  It appears indisputable that this language constitutes at least an implicit waiver of the Central Bank's sovereign immunity with respect to the instant lawsuit.  *See* 28 U.S.C. § 1605(a)(1) (providing that a foreign state can "waive[] its immunity either explicitly or by implication"); *see also Ashraf-Hassan v. Embassy of Fr.*, 40 F. Supp. 3d 94, 100 (D.D.C. 2014) ("[A]n implied waiver may arise where a foreign state concludes a contract that contains a choice-of-law clause designating the laws of the United States as applicable." (citing *World Wide Minerals, Ltd. v. Republic of Kaz.*, 296 F.3d 1154, 1161 n.11 (D.C. Cir. 2002))), *aff'd*, 610 F. App'x 3 (D.C. Cir. 2015); H.R. Rep. No. 94-1487, at 18 (listing a foreign state's "agree[ment] that the law of a particular country should govern a contract" as an example of an "implicit waiver" for FSIA purposes).

Thus, the key question is whether then-Governor Masangu, who allegedly signed the Retainer Agreement in CapitalKeys's D.C. office on behalf of the Central Bank, had the requisite *authority* to bind the Central Bank to this implied agreement to waive its sovereign immunity with respect to the agreement's obligations.  *See SACE*, 243 F. Supp. 3d at 32 (explaining that a "waiver of sovereign immunity must have been made by someone who has, or at the very least appears to have, the authority to act on behalf of the foreign sovereign with respect to such a waiver" (emphasis omitted)); *see also supra* Part II.A.  And as explained below, the Court concludes that the factual

allegations of CapitalKeys's complaint are insufficient to demonstrate that Governor Masangu possessed the requisite authority, for several reasons.[12]

To start, it is necessary to establish the level of authority that must exist for a waiver of sovereign immunity for FSIA purposes, and in that regard, this Court has previously determined that "*apparent* authority is insufficient to waive sovereign immunity" under the FSIA, as a matter of law.  *SACE*, 243 F. Supp. 3d at 38 (emphasis added).  In other words, for FSIA purposes, *actual* authority to waive sovereign immunity is required.  *See id.* (explaining that "the FSIA's waiver exception plainly evinces Congress' intent to require 'the foreign state' to act, and when that provision is considered in light of statute as a whole, the best reading of that term is that it[] encompasses only those representatives who are actually authorized to act on behalf of the state").[13]  This means that even if one assumes, *arguendo*, that CapitalKeys could satisfy the apparent authority standard under the circumstances presented in this case—*e.g.*, by showing, first, that the Central Bank manifested to CapitalKeys that Governor Masangu was authorized to enter into the Retainer Agreement on behalf of the Central

---

[12] To be precise, the requisite authority that an agent such as Governor Masangu must have for purposes of the FSIA's waiver exception is the "authority to waive [the foreign state's] sovereign immunity[,]" *SACE*, 243 F. Supp. 3d at 34, not the mere power to enter into an agreement that contains a waiver provision.  One can imagine a circumstance in which Governor Masangu may have had the authority to enter into the underlying service contract on behalf of the Central Bank under Congolese law, but was still not authorized to waive the Central Bank's sovereign immunity.  *Compare Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 102 (D.C. Cir. 2015) (noting that the FSIA's arbitration exception "only requires a valid agreement . . . to submit to arbitration," which is "separate from the obligations the parties owe to each other under the remainder of the contract" (internal quotation marks and citations omitted)).  CapitalKeys has not pointed to any provision of Congolese law that purports to authorize the Governor of the Central Bank to waive the Central Bank's sovereign immunity with or without the Central Bank's express consent, and the parties appear to have assumed that the applicability of the FSIA's waiver exception turns on Governor Masangu's authority to enter into the Retainer Agreement as a whole.  This Court's analysis follows that assumption.

[13] The Court is not aware of any contrary D.C. Circuit precedent, and CapitalKeys has not even acknowledged this holding, let alone provided a reason for this Court to revisit it.

Bank, and, second, that CapitalKeys reasonably believed that Governor Masangu had that authority in light of the Central Bank's manifestations, *see id.* at 39; *see also Transamerica Leasing, Inc. v. La Republica de Venez.*, 200 F.3d 843, 850 (D.C. Cir. 2000)—such a demonstration would *still* fall short of demonstrating the applicability of the FSIA's waiver exception.[14]

To clear the actual authority bar, the party seeking to attribute an agent's act to the principal must show that "the agent ha[d] the power 'to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him.'" *Makins v. District of Columbia*, 277 F.3d 544, 548 (D.C. Cir. 2002) (quoting Restatement (Second) of Agency § 7); *see also SACE*, 243 F. Supp. 3d at 39 (noting that the Restatement of Agency "is a useful beginning point for a discussion of general agency principles" when "applying agency principles to federal statutes" such as the FSIA (internal quotation marks and citation omitted)).  Put another way, actual

---

[14] For what it's worth, CapitalKeys's apparent-authority arguments (*see* Pl.'s Opp'n at 14) would fail even if apparent authority is sufficient to effect a waiver, because the contentions CapitalKeys makes in this regard are either legally insufficient or wholly implausible.  For example, CapitalKeys touts "the Governor['s] represent[ation] that he had the authority to sign a contract on behalf of the Central Bank" (*id.*), but apparent authority requires a manifestation of authorization *by the principal* (the Central Bank) rather than the agent (Governor Masangu), *see SACE*, 243 F. Supp. 3d at 39.  Moreover, CapitalKeys's bare assertion that "it was reasonable for CapitalKeys to rely on [Governor Masangu's] representation" (Pl.'s Opp'n at 14) lacks any factual basis from which one might conclude that it was reasonable to rely on that representation.  This Court also sees nothing in CapitalKeys's complaint or the scant evidence it has submitted that could possibly give rise to a reasonable belief that Governor Masangu had the authority to act on behalf of *the Central Bank*.  The alleged facts that "authorized representatives from the Congo came to the offices of CapitalKeys in Washington D.C. to formalize the parties' agreement in writing" (Compl. ¶ 14); that Governor Masangu signed the Retainer Agreement "[w]ith authorization from the President of Congo" (*id.* ¶ 17); and that "the Congo made an initial payment of $600,000 towards the total" contract price prior to the agreement's execution (*id.* ¶ 46) indicate, at most, that *the Congo* authorized the agreement—they say nothing about apparent authority to bind the Central Bank itself.  Nor does the self-serving declaration of CapitalKeys's president concerning the alleged fact that the Central Bank "arrived at an agreement with CapitalKeys to retain our services after approximately six months of negotiations" (Decl. of Adam Falkoff ("Falkoff Decl."), ECF No. 24-29, ¶ 2) suffice to establish that any such negotiations took place, especially in the absence of details or documentary evidence that would substantiate those alleged negotiations and potentially establish the reasonableness of CapitalKeys's alleged reliance upon them.

authority "is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf."  Restatement (Third) of Agency § 3.01; *see also, e.g.*, *A-J Marine, Inc. v. Corfu Contractors, Inc.*, 810 F. Supp. 2d 168, 175 (D.D.C. 2011). Moreover, and notably, when the principal is an organization, the principal "manifests its assent to be bound by the acts of individuals through the observable connections between the individual and the organization[,]" such as by "appointing that person to a position defined by the organization."  Restatement (Third) of Agency § 1.03 cmt. c; *see also Uhar & Co. v. Jacob*, 840 F. Supp. 2d 287, 291 (D.D.C. 2012) (observing that "[t]he scope of a corporate agent's actual authority is generally defined by the corporation's articles of incorporation and bylaws").

Significantly for present purposes, "[w]ithin public-sector organizations, the authority associated with a position is often defined by legislation or by administrative regulation."  Restatement (Third) of Agency § 1.03 cmt. c.  Consequently, when assessing whether a government official had actual authority to act on behalf of a foreign state for FSIA purposes, courts typically examine whether the official's action was consistent with the foreign state's statutes and regulations concerning the official's position and the activity in question.  *See, e.g.*, *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1, 9–10 (D.D.C. 2013) (holding that a Ghanaian government official lacked actual authority to enter into a binding contract on behalf of Ghana because "all government contracts require approvals" from the Ghanaian parliament and "cabinet level members" of the Ghanaian government under Ghana's constitution and certain Ghanaian statutes), *aff'd*, No. 14-7036, 2015 WL 3653187 (D.C. Cir. June 9, 2015);

*Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*, 899 F.3d 1081, 1089 (9th Cir. 2018) (concluding that the director of a Mexican state-owned corporation lacked actual authority to enter into a contract on behalf of the corporation because the contract "required board approval under both Mexican federal law and [the corporation's] internal policies").

Even a cursory examination of the respective statutory powers and responsibilities of the Governor and the Board of the Central Bank under Act No. 005/2002—the Congolese law that established the Central Bank—demonstrates that Governor Masangu lacked actual authority to enter into the Retainer Agreement unilaterally on behalf of the Central Bank.[15]  The Act describes the Board of the Central Bank as "the highest body with the most extensive powers to conceive and direct the Bank's policy and supervise the management thereof."  Act No. 005/2002 art. 18.[16] Indeed, according to Act No. 005/2002, "[w]ithout prejudice to the other provisions of this act, the Board oversees *all activities of the Bank*, in particular . . . the definition and implementation of the monetary policy[,]" "credit and exchange regulations[,]" "the drafting of the budget and preparation of the annual accounts[,]" and "the definition of staff regulations, in particular the conditions for travel and terms of office for all staff

---

[15] In this analysis, the Court has given relatively little weight to the Central Bank's declarations regarding the proper interpretation of Act No. 005/2002 (*see* Ramazani Decl. ¶¶ 3–10; Nyembo Decl. ¶¶ 5–7), which largely repeat the arguments in the Central Bank's briefs.  (*See* Def.'s Mot. at 15–16; Def.'s Reply at 11–14.)  These declarations appear to have been created "in the context of litigation," and thus warrant a degree of "caution[.]"  *Animal Sci. Prods.*, 138 S. Ct. at 1873.  The declarations also refer only to the text of the Congolese statute, and as a result, they "shed little light on the meaning of [its] law as it would be interpreted by that nation's courts."  *In re Grand Jury Subpoena*, 912 F.3d 623, 634 (D.C. Cir. 2019); *see also id.* (discounting foreign declarations that "contain[ed] no citations to authority or [the foreign country's] case law" and that "were plainly prepared with this particular proceeding in mind").

[16] The text of Act No. 005/2002 has been translated from its original language of French.  (*See* Ex. 3 to Def.'s Reply, ECF No. 67-3, at 9.)

members." *Id.* (emphasis added).  The Act further provides that "[t]he Board takes all the actions that it deems necessary for the due execution of the primary and secondary duties entrusted to the Central Bank of the Congo under this act." *Id.* art. 19.

By contrast, the Governor of the Central Bank "manages the Bank" and "prepares and implements the actions of the Board." *Id.* art. 29.  Thus, "[t]he Governor has all the powers necessary to perform the day-to-day management of the Bank" and "gives instructions regarding said management and supervises its implementation." *Id.* art. 30.[17]  The Act also specifically provides that the Governor must "submit[] draft[] acts that he deems necessary to accomplish the Bank[']s mission and policy to the Board for their approval." *Id.* art. 31.

Given this clear and established delineation of the relative duties of the Board and the Governor, as an initial matter, it does not appear that the Governor has the authority to bind the Central Bank to *any* contract without input from the Board or another Bank official, not to mention an agreement of the scope and scale of the contract at issue in this case.  The only statutory provision that could conceivably grant the Governor contracting authority is Article 31, but that provision authorizes the

---

[17] In this regard, the Act specifies that

> [t]he Governor represents the Bank in all its interactions and relationships with third parties, including the Government and as such has the following powers:
> a- To solely sign banknotes and currency issued by the Bank; the annual reports, balance sheets and results analysis table;
> b- To solely or jointly sign contracts concluded by the Bank, the Banks' correspondence and other documents;
> c- [T]o sign, in accordance with the Bank's staff regulations, staff employment contracts, promotions and dismissals;
> d- To represent the Bank in legal proceedings;
> e- To delegate the powers conferred on him by the provisions of paragraphs b and d of this article to Bank officials[.]

Act No. 005/2002 art. 31.

Governor to "sign contracts *concluded by the Bank*," *id.* (emphasis added), and the use of this past participial phrase suggests that a contract must have been approved by the Bank, acting through the Board or another Bank official to whom authority has been delegated by statute or regulation, before the Governor "sign[s]" the contract to give it legal effect, *see Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39 (2008) (noting that the "past participle" verb form "indicat[es] past or completed action" (internal quotation marks and citation omitted)).  This interpretation is consistent with the other powers of the Governor that are enumerated in Article 31, such as the power to "sign banknotes and currency issued by the Bank" and "sign . . . staff employment contracts," which appear to be largely ministerial functions.  Act No. 005/2002 art. 31.  And in light of this crucial textual context, it would be exceedingly odd to conclude that the Governor has the power to bind the Bank to contractual obligations unilaterally (*i.e.*, without the Board's assent), which is, in essence, what CapitalKeys argues here.

In any event, even assuming the Governor has the authority to act unilaterally with respect to binding the Central Bank to *some* contracts, it is clear to this Court that the Retainer Agreement falls well outside that contract category.  Article 30 plainly provides that the Governor "has all the powers necessary to perform the day-to-day management of the Bank[,]" Act No. 005/2002 art. 30, and the final clause of Article 31 establishes that the Governor must "submit[]" any "draft[] acts that [the Governor] deems necessary to accomplish the Bank[']s mission and policy to the Board for their approval[,]" *id.* art. 31.  In this Court's view, the Governor's execution of a multimillion-dollar Retainer Agreement for a broad suite of significant services such as

"[a]ssist[ing] the Central Bank to modernize its internal infrastructure" (App. A at A-3) *far* transcends the Bank's day-to-day management, and is much more akin to a "draft[] act[]" that requires Board approval.  The contract that Governor Masangu allegedly executed while visiting CapitalKeys's offices contemplated that CapitalKeys would provide services with transformational significance for the Congolese economy (*see, e.g.*, *id.* at A-2 (promising that CapitalKeys would "[a]ssist [the] Central Bank in strategies to reduce inflation and stabilize the currency" and "[a]dvise [the] Central Bank on the creation of a new stock market")); therefore, whatever the precise scope of the Governor's unilateral contracting authority may be, given the Governor's relatively limited mere-management authority, the Retainer Agreement plainly transcended the scope of any such authority.

In its quest to persuade the Court otherwise, CapitalKeys relies heavily on a district court decision from another jurisdiction, *Themis Capital, LLC v. Democratic Republic of Congo*, 35 F. Supp. 3d 457 (S.D.N.Y. 2014), *aff'd in part, rev'd in part, and remanded*, 626 F. App'x 346 (2d Cir. 2015), but in this Court's view, that decision is based on facts that are materially different from the facts at issue here.  *Themis Capital* addressed whether the Central Bank's Governor and the Congo's Vice Finance Minister had authority to enter into a debt acknowledgment letter on behalf of the Congo.  *See id.* at 473.  Notably, in that case, the Congo's President had signed an ordinance that expressly authorized those two individuals to sign the underlying credit agreement and also charged them with implementing the agreement, *see id.* at 461–62, and under those circumstances, there was little doubt that the Governor and the Vice Finance Minister had been granted actual authority to bind the Central Bank and the

Congo to the debt acknowledgement letter, *see id.* at 474–75, 478.  Thus, the Second Circuit affirmed the district court's actual authority determination, specifically holding that the district court had "properly concluded, as a matter of law, that the Finance Minister and the Governor of the Central Bank had actual authority to sign the [debt acknowledgment letter] pursuant to [the President's ordinance], which charged those very officials with implementing the Credit Agreement until all outstanding debt was fully paid."  *Themis Cap., LLC v. Democratic Republic of Congo*, 626 F. App'x 346, 348 (2d Cir. 2015).

To be sure, in a footnote, the district court in *Themis Capital* had acknowledged that the plaintiffs *also* relied on Article 31 of Act No. 005/2002 "as a separate basis for the Central Bank Governor's authority to sign the 2003 Acknowledgment Letter[,]" *Themis Cap.*, 35 F. Supp. 3d at 475 n.12, and in that regard, the district court "agree[d] with plaintiffs that Article 31 authorized the Central Bank Governor to enter into contracts on the Central Bank's behalf[,]" *id.*  But the court saw "no need here to rely on Act No. 005/2002's general grant of contracting authority," because the ordinance and credit agreement "gave both the Finance Minister and the Central Bank Governor the necessary authority to sign the . . . debt acknowledgment letters."  *Id.* Consequently, *Themis Capital*'s brief discussion of Article 31 is dicta, insofar as the district court's actual authority determination was based on the existence of another source of law (the President's ordinance and the credit agreement), whereas no such alternative font of authority appears in the record of the instant case.  Moreover, and in any event, neither the district court nor the Second Circuit grappled with the text of Article 31.

This all means that *Themis Capital* is not persuasive authority concerning the scope of the Governor's contracting authority under Article 31.  And as discussed above, a thorough consideration of that statute leads inexorably to the conclusion that the Governor is not authorized to engage in the unilateral execution of any and all contracts on behalf of the Central Bank.  Therefore, in the absence of any other law that speaks persuasively to Governor Masangu's powers, this Court has little trouble concluding that CapitalKeys's complaint and the accompanying documents—which do not allege that Governor Masangu sought or obtained *the Board's* approval before or after signing the Retainer Agreement (*see* Compl. ¶¶ 14, 17), much less provide any evidence for that proposition, and do not identify any other Congolese statute, regulation, or other law that purports to authorize Governor Masangu to bind the Central Bank to the Retainer Agreement—fail to demonstrate that Governor Masangu had actual authority to enter into the Retainer Agreement on behalf of the Central Bank. And because the contract was not authorized, its choice-of-law provision is insufficient to qualify as an implicit waiver of the Central Bank's sovereign immunity for FSIA purposes.  *See SACE*, 243 F. Supp. 3d at 34.

### B.      CapitalKeys Has Not Established That The Commercial-Activity Exception Applies

CapitalKeys also argues, albeit in significantly less detail, that this Court can exercise subject-matter jurisdiction over its contract-based legal claims against the Central Bank under the FSIA's exception for commercial activity.  (*See* Compl. ¶ 9; *see also* Pl.'s Opp'n at 11.)  In this regard, CapitalKeys relies on the *first* clause of the commercial-activity exception (*see* Pl.'s Opp'n at 11), which permits the court to exercise jurisdiction in spite of a foreign-state defendant's sovereign immunity when

"the action is based upon a commercial activity carried on in the United States by the foreign state[,]" 28 U.S.C. § 1605(a)(2); *see also id.* (authorizing suit when the action is based upon "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere" (clause two) or "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States" (clause three)). Courts assessing whether a plaintiff's legal claims fall within the first prong of section 1605(a)(2) apply what can fairly be characterized as a four-part test that tracks the statutory language: the court (1) identifies the specific conduct that the plaintiff's claims are "based upon[,]" and then determines (2) whether that conduct qualifies as a "commercial activity"; (3) whether that conduct was "carried on in the United States"; and (4) whether that conduct was carried on "by the foreign state[.]" *Id.*; *see, e.g.*, *Friedman v. Gov't of Abu Dhabi*, 464 F. Supp. 3d 52, 67–70 (D.D.C. 2020); *Jam v. Int'l Fin. Corp.*, 442 F. Supp. 3d 162, 171 (D.D.C. 2020); *Rosenkrantz v. Inter-Am. Dev. Bank*, No. 20-cv-3670, 2021 WL 1254367, at *9 (D.D.C. Apr. 5, 2021).

Applying this framework, this Court finds that the first two aspects of the prong one inquiry are satisfied, because the gravamen of CapitalKeys's claims is Defendants' failure to pay for the firm's commercial services in accordance with the terms of the Retainer Agreement.  But for the reasons that follow, the Court concludes that the commercial-activity exception does not apply, because CapitalKeys has failed to carry its burden of production with respect to establishing the remaining requirements of clause one—*i.e.*, that the conduct upon which its claims are based was carried on in the United States and by the foreign state.

1.     CapitalKeys's Claims Are Based Upon Defendants' Alleged Breach Of The Retainer Agreement, Which Qualifies As "Commercial Activity" For The Purpose Of Prong One Of The FSIA's Commercial-Activity Exception

Starting with the question of what activity CapitalKeys's claims are "based upon," the Supreme Court has explained that the statutory phrase "based upon" is "read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993). But the Supreme Court has also made clear that "the mere fact that" an act performed in the United States "would establish a single element of a claim is insufficient to demonstrate that the claim is 'based upon' that [act] for purposes of" the commercial-activity exception. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 34 (2015). Instead, "an action is based upon the particular conduct that constitutes *the gravamen* of the suit[,]" *id.* at 35 (emphasis added) (internal quotation marks omitted); thus, a reviewing court must "zero[] in on the core of [the plaintiff's] suit[,]" *id.—i.e.*, the foreign state's conduct that "actually injured" the plaintiff, *id.* at 34.

As relevant here, several courts have recognized that the "core" or "gravamen" of breach-of-contract and associated equitable claims is generally the foreign state's breach of its contractual obligations to the plaintiff, since that is the conduct that "actually injured" the plaintiff. *See, e.g., Friedman*, 464 F. Supp. 3d at 68 (concluding that "[t]he gravamen of [plaintiff's] equitable claims" in breach-of-contract suit was that "Abu Dhabi broke its promise . . . to pay [plaintiff] in exchange for valuable services rendered"); *Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 207 (2d Cir. 2018) (holding in a breach-of-contract case that the plaintiff's "lawsuit [was] 'based on' Argentina's breach of a commercial obligation");

*Devengoechea v. Bolivarian Republic of Venez.*, 889 F.3d 1213, 1223 (11th Cir. 2018) (determining that "[t]he conduct that actually injured [plaintiff]—and therefore that makes up the gravamen of [his] lawsuit—is Venezuela's failure to return [certain artwork] to [him] or to pay him for it" in breach of a bailment agreement).  Consistent with these holdings, it would seem that the gravamen of CapitalKeys's claims is the Central Bank's alleged refusal to pay CapitalKeys the remainder of the contract price under the Retainer Agreement on day one of the contract term or at any time thereafter. (*See, e.g.*, Compl. ¶¶ 48–49 (asserting as basis for breach-of-contract claim that Defendants "failed to make the agreed upon payment, and ha[ve] yet to pay on the outstanding balance").)[18]  Therefore, as far as the FSIA's commercial-activity exception is concerned, CapitalKeys's legal "action" is "based upon" the Central Bank's nonpayment of the remaining $16,002,000 allegedly owed to CapitalKeys pursuant to the agreement, 28 U.S.C. § 1605(a)(2), which means that the first aspect of prong one of the commercial-activity exception is satisfied.

It is also undisputed that the second criteria—*i.e.*, that the conduct that is the basis for the legal action qualifies as commercial activity—is present here as well.  (*See* Pl.'s Opp'n at 11; Def.'s Reply at 15.)  The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d).  And the Central Bank's alleged breach of its payment

---

[18] Of course, at the time of signing, CapitalKeys had yet to render any services, making its implicit claim of injury doubtful at best.  But District of Columbia law recognizes expectation damages as a permissible "measure of actual damages arising from a breach of contract[.]"  *CapitalKeys*, 278 F. Supp. 3d at 272 (citing, *e.g.*, *United House of Prayer for All People v. Therrien Waddell, Inc.*, 112 A.3d 330, 339–40 (D.C. 2015)).  So, at least in theory, the gravamen of CapitalKeys's complaint arose out of the circumstances of the initial breach for FSIA purposes.  Moreover, as explained below, CapitalKeys's legal claims are also seemingly based upon Defendants' continued nonpayment after the contract term began.  *See infra* Part III.B.2.

obligations under the Retainer Agreement unquestionably qualifies as a "commercial activity" for FSIA purposes.  *See Weltover*, 504 U.S. at 614 (concluding that a "foreign sovereign's actions are 'commercial' within the meaning of the FSIA" when the "foreign government acts, not as regulator of a market, but in the manner of a private player within it").  Indeed, the Supreme Court has long explained that the relevant inquiry "is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives[,]" but rather "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce[.]" *Id.* (internal quotation marks and citation omitted); *see also id.* at 614–15 (contrasting, on the one hand, "a foreign government's issuance of regulations limiting foreign currency exchange[,]" which is "a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party[,]" with "a contract to buy army boots or even bullets[,]" on the other, which qualifies as "a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods").

Consequently, even though the *purpose* of the Retainer Agreement involves the Central Bank's sovereign objectives—such as "reduc[ing] inflation[,]" "stabiliz[ing] the currency[,]" and "creat[ing] . . . a new stock market for a stronger economy" (App. A at A-2)—contracts for services, including strategic communications services like those at issue here (*id.*), are the types of actions often undertaken by organizations engaged in commerce, *see, e.g.*, *Kettey v. Saudi Ministry of Educ.*, 53 F. Supp. 3d 40, 50 (D.D.C. 2014) (observing that "[c]ontracts for services are generally considered commercial activities"); *Friedman*, 464 F. Supp. 3d at 70 (holding that a contract "to lobby the U.S.

government to advance [the foreign state's] interests in exchange for payment" qualified as commercial activity under the FSIA).  And it follows that the *breach* of any such contract qualifies as a commercial activity as well.  *See de Csepel v. Republic of Hung.*, 714 F.3d 591, 599 (D.C. Cir. 2013) ("[A] foreign state's repudiation of a contract is precisely the type of activity in which a private player within the market engages." (internal quotation marks and citation omitted)).

> 2.  CapitalKeys Has Not Demonstrated That The Conduct Upon Which Its Legal Claims Are Based Occurred In The United States Or That The Alleged Breach Is Actually Attributable To The Central Bank

That said, in order to satisfy the first prong of the commercial-activity exception fully, CapitalKeys must produce evidence that demonstrates that the commercial activity at issue was "carried on in the United States[,]" 28 U.S.C. § 1605(a)(2), and that the foreign state itself is the responsible actor, *see id.* (requiring that the commercial activity be carried on "by the foreign state").  And it is well established that it is not sufficient for the foreign state's conduct to have "isolated or transitory contacts with the United States[.]"  *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1513 (D.C. Cir. 1988).  Rather, the FSIA itself provides that the exception only pertains to claims based on "commercial activity carried on by such state and having *substantial contact* with the United States."  28 U.S.C. § 1603(e) (emphasis added); *see also Nelson*, 507 U.S. at 356.

Notably, courts generally deem a foreign state's nonpayment in breach of a contractual obligation to have been "carried on *in the country in which the foreign state is located.  See, e.g.*, *Kettey*, 53 F. Supp. 3d at 51 (noting that Saudi government entities' "non-payment" in breach of a contract "occurred in Saudi Arabia"); *Lempert v. Republic of Kaz.*, 223 F. Supp. 2d 200, 203 (D.D.C. 2002) (observing that Kazakhstani

government agency's "non-payment" in violation of a contractual obligation occurred "in Kazakstan"), *aff'd*, 62 F. App'x 355 (D.C. Cir. 2003); *cf. Devengoechea*, 889 F.3d at 1224 (observing that "Venezuela's decision not to pay [plaintiff] for the Collection or to return the Collection to him" in violation of their agreement "occurred outside the United States" for purposes of clause three of the commercial-activity exception).  So, too, here: as suggested in the complaint itself, the Central Bank's allegedly deliberate nonpayment occurred in the Congo rather than the United States.  (*See, e.g.*, Compl. ¶ 25 ("[W]hen the [Congo's] delegate returned to the Congo, they failed to make the payment to CapitalKeys.").)

CapitalKeys cannot now successfully revert to claiming that it is the locus of the execution of the contract, rather than the breach, that matters after all, because it is reasonably clear that the mere execution of a contract in the United States is precisely the sort of incidental connection to the United States that does not satisfy the statute's "substantial contact" requirement.  *Cf. Kettey*, 53 F. Supp. 3d at 51 (holding that clause one of the commercial-activity exception was not satisfied when plaintiff's performance and defendants' nonpayment "occurred in Saudi Arabia[,]" even though plaintiff "was interviewed in the United States and signed his contract in the United States").  Nor does it matter that Governor Masangu allegedly effected a breach of the contract when he signed the Retainer Agreement without contemporaneously paying the full contract price.  (*See* Compl. ¶¶ 14, 17–18.)  Under the terms of the agreement, payment was to be made by wire transfer directly into CapitalKeys's Wells Fargo bank account, not by Governor Masangu's tender of cash or check at the scene of the signing (*see* App. A at A-4), and, regardless, CapitalKeys allegedly excused that initial breach by accepting the

Central Bank's promise of future payment and beginning work under the contract nevertheless (*see* Compl. ¶¶ 18–19). *See also* 13 Williston on Contracts § 39:31 (4th ed. 2021) ("A party to a contract may waive . . . a breach of the contract's provisions[] by conduct manifesting a continued recognition of the contract's existence after learning of the breach . . . , such as by continuing to perform[.]").  Thus, even if the initial breach of the Retainer Agreement arguably occurred in the United States, CapitalKeys's claims actually rest upon the Central Bank's subsequent nonpayment despite its alleged repeated promises to pay (*see, e.g.*, Compl. ¶¶ 25–26, 37–38), which, by all accounts, occurred in the Congo.

To be sure, a foreign state's commercial conduct can still have the requisite "substantial contact with the United States" even if that conduct does not itself occur in the United States, 28 U.S.C. § 1603(e), and, as a result, some courts have determined that a foreign state's nonpayment in breach of a contract can satisfy prong one of the commercial-activity exception if *the plaintiff* performed *its* contractual obligations in the United States, *see Friedman*, 464 F. Supp. 3d at 68 (concluding that foreign state's "failure to pay [plaintiff] ha[d] 'substantial contacts' with the United States" where "the services [plaintiff] provided[] all occurred in the United States"); *Lanny J. Davis & Assocs. LLC v. Republic of Eq. Guinea*, 962 F. Supp. 2d 152, 159 (D.D.C. 2013) (holding that substantial-contact requirement was satisfied where the court had "no reason to doubt" that "the majority of [plaintiff's] work was performed . . . in Washington, D.C.").  However, for present purposes, CapitalKeys has not demonstrated that the firm performed *any services whatsoever* pursuant to the Retainer Agreement, much less that it served the Central Bank and the Congo by providing the contracted-for

services *inside the United States*.  (*See* Def.'s Reply at 15 (raising a factual challenge with respect to CapitalKeys's allegations regarding its performance).)

First of all, nothing in the Retainer Agreement speaks to where CapitalKeys's services will be performed; the contract merely states that CapitalKeys "*intend[s]* to work through our Washington, DC resources and country-based resources on these matters from our Washington, DC offices[.]"  (App. A at A-5 (emphasis added).)  Thus, the terms of the contract did not require CapitalKeys to perform its obligations in the United States.  Even more importantly, it bears stressing and repeating that, throughout the pendency of this litigation, CapitalKeys has never produced a single iota of documentary evidence that establishes that it performed *any* tasks or provided *any* services under the Retainer Agreement, despite being asked repeatedly for such evidence by the Court.  (*See* Mot. to Dismiss Hr'g Tr. at 8:11–13, 10:3–10 ("THE COURT: . . . [D]o you have any objective evidence, internal documents demonstrating work on the—on this contract? . . . [A]ll I'm asking is what documentary evidence do you have concerning the work that your clients have actually done?  [CapitalKeys's counsel]: We certainly have in the complaint—and . . . it hasn't been disproved or even refuted—that the Congo got hundreds of millions of dollars through our client's efforts.  Now, the other side may say prove it, but it hasn't been disproved[.]"); *see also, e.g.*, Mot. to Set Aside Default J. Hr'g Tr., ECF No. 61, at 52:13–22 ("THE COURT: And surely you have receipts and documentation and records of those meetings?  You have minutes?  You have some sort of, he came here, we paid for his hotel. . . . MR. FALKOFF: I have probably in my calendar when he's coming.  I have my passport stamps when I would go over there[.]"); Mot. for Default J. Hr'g Tr., ECF No. 31, at

16:6–12 ("THE COURT: . . . But is there any record, documentation of a letter from the Congo that says, We're going to pay you, don't worry?  [CapitalKeys's counsel]: Well, again, I had the same questions you did.  And I was told that the Congo, they don't really write letters, they don't write emails.  They don't do phones.").)

Indeed, the only evidence that CapitalKeys has ever produced concerning its purported work to benefit the Congo and the Central Bank is the self-serving testimony of CapitalKeys's president (*see, e.g.*, Falkoff Decl. ¶ 18; Mot. for Default J. Evid. Hr'g Tr. at 10:9–17), and that testimony is surprisingly generic: Falkoff uses only the broadest terms to discuss the services CapitalKeys purportedly rendered, and he provides little to no information about *where* and *how* the alleged services were performed.  For example, in his declaration, Falkoff avers that CapitalKeys "counsel[ed] Congolese officials . . . on exactly how to work with the IMF to solve" issues regarding disbursements (Falkoff Decl. ¶ 13); "instruct[ed] [Congolese] government officials . . . on how to elevate the global image of the Congo" (*id.* ¶ 18); "assist[ed] the Central Bank in modernizing their internal infrastructure" (*id.*); "impart[ed] critical strategies for representatives from the Congo to use when negotiating with the United States Agency for International Development" (*id.* ¶ 19); and "connect[ed] representatives from the Congo (including the Central Bank) with high-powered individuals in other foreign governments and institutional leaders" (*id.* ¶ 20).  These statements provide no insight whatsoever into the all-important who, what, when, and where of these alleged events, nor do they address whether CapitalKeys's employees provided those services in the United States, traveled to the Congo themselves, or hired subcontractors in the Congo to perform those tasks.

To be fair, with respect to two of the services that the firm purportedly rendered pursuant to the Retainer Agreement during the five-year contract term—its alleged "counsel[ing]" of the Central Bank's Governor and the Congolese President's counsel regarding the IMF (*id.* ¶ 13), and its purported "moderniz[ation]" of the Central Bank's internal infrastructure (*id.* ¶ 18)—CapitalKeys does provide additional details.  But from the standpoint of explaining the locus of these activities, and who from CapitalKeys was involved, and what exactly was done, CapitalKeys's description of these services is similarly defective.  During the evidentiary hearing that Magistrate Judge Kay held during the default-judgment stage, for example, Falkoff merely testified that CapitalKeys "strategized with" the Governor of the Central Bank "and his team on what they were doing wrong and who they should talk to [in order] to hopefully rectify [the IMF issue] when several other members of their government failed."  (Mot. for Default J. Evid. Hr'g Tr. at 40:8–11.)  Once again, this testimony fails to establish what services CapitalKeys actually provided and whether any such service occurred inside the United States.  And CapitalKeys's evidence with respect to its purported work in modernizing the Central Bank's internal infrastructure suggests that these services actually took place in the Congo.  (*See, e.g.*, *id.* at 10:9–17 (Falkoff testifying that "we need feet on the ground, because I didn't intend to be flying back and forth constantly to the Congo. . . . [W]e hired a few people over there who had set up . . . the IT for their cellphone network and the towers there who were very knowledgeable about technology and systems that . . . had good relations with the Central Bank.  And people that also had relations with vendors in India who would provide the technology to put it all together."); *id.* at 12:6–10 (Q. "You went out and you hired subcontractors, you put the

government in touch with other vendors so they could purchase computers and things like that directly?"  A. "Correct."); Decl. of Adam Falkoff in Supp. of Mot. to Modify J., ECF No. 50-1, ¶¶ 3–4 (stating that "work related to the infrastructure modernization project ceased in mid-September 2018" when CapitalKeys was "informed by subcontractors [it] had hired who were working in Kinshasa, DRC, that it had become impossible to continue to perform work because the Congo's employees with whom the subcontractors had been working had left their posts in Kinshasa").)

Given the surprising lack of documentation and detail in the record concerning what, if anything, CapitalKeys has done to fulfill its obligations under the Retainer Agreement, it is not surprising that the Central Bank maintains that "CapitalKeys has never come forward with any credible evidence that it did anything for the Bank" or the Congo.  (Def.'s Reply at 6; *see also* Ramazani Decl. ¶¶ 11–13 (head of the Central Bank's legal department averring that he "ha[s] not seen any work CapitalKeys has done to modernize the Central Bank's infrastructure" and that "CapitalKeys has likewise not completed any other projects for the Central Bank").)  As relevant here, CapitalKeys's abject failure to document its performance in any respect means, at the very least, that CapitalKeys has not adequately demonstrated that any services it allegedly provided to Defendants under the contract took place inside the United States such that its legal claims can properly be construed as being based on commercial activity "having substantial contact with the United States[,]" so as to satisfy the first clause of the FSIA's commercial-activity exception.  28 U.S.C. §§ 1603(e), 1605(a)(2).

The Court notes further that, even if CapitalKeys could somehow be credited with having satisfied its initial burden of production concerning the first three hurdles

of the first prong of the commercial-activity exception, it would still fall short at the

fourth requirement, because, like the FSIA's waiver exception, the FSIA's commercial-

activity exception is predicated on certain conduct of "the foreign state[.]"  *See* 28

U.S.C. § 1605(a)(2) (stating that a legal action can be maintained against a foreign state

when "the action is based upon a commercial activity carried on in the United States *by*

*the foreign state*" (emphasis added)).  And courts have long held that "the commercial

activity exception may be invoked against a foreign state only when its officials have

actual authority."  *SACE*, 243 F. Supp. 3d at 35 (quoting *Velasco v. Gov't of Indon.*, 370

F.3d 392, 400 (4th Cir. 2004)); *see also, e.g.*, *TJGEM*, 26 F. Supp. 3d at 9–10 & n.5

(concluding that plaintiff "failed, at the outset, to meet its burden of showing the

commercial activity exception applies" because plaintiff's claims were "based upon the

alleged actions of [a] single Ghanaian official" who "lacked the authority" to "enter

into a binding contract on behalf of Ghana").  This Court has already examined whether

acts in connection with the execution of the Retainer Agreement qualify as activity *by*

*the Central Bank*, and for the reasons explained in Part III.A, *supra*, the Court has

concluded that Governor Masangu did not have actual authority to act on the Central

Bank's behalf.  It follows from well-established agency principles that any breach of

that obligation also cannot be attributed to the Central Bank.  *See, e.g.*, *Packsys*, 899

F.3d at 1089 (concluding that plaintiff "could not invoke the commercial activity

exception" based on foreign state's failure to pay for goods in alleged breach of

contract where official who executed contract "lacked actual authority to enter the

contract with [plaintiff] on behalf of [the foreign state]"); *see also* Restatement (Third)

of Agency § 6.01 cmt. b (noting that a principal may be subject to liability on a contract

entered into by the principal's agent only when the agent "acted with actual or apparent authority"). Therefore, the Central Bank's alleged nonpayment cannot form the basis for application of the FSIA's commercial-activity exception.[19]

## C.   CapitalKeys Has Not Demonstrated That Jurisdictional Discovery Is Warranted Or That The Central Bank's Sovereign Immunity Argument Is Precluded

CapitalKeys's last-ditch effort to sustain its legal action despite the Central Bank's invocation of sovereign immunity—by requesting that CapitalKeys "be permitted to conduct limited jurisdictional discovery related to the Central Bank's claim of sovereign immunity" (Pl.'s Opp'n at 17), and by attempting to sidestep the jurisdictional issue altogether on preclusion grounds (*see id.* at 9)—is baseless and is therefore similarly unavailing.

For example, while CapitalKeys insists that "limited jurisdictional discovery would show that the Governor of the Central Bank had both actual and apparent authority to sign the relevant contract" (*id.* at 17), "[w]hether to permit jurisdictional discovery rests in the discretion of the district court[,]" *In re Papst Licensing GMBH &*

---

[19] CapitalKeys has made no argument that the second or third clauses of the FSIA's commercial-activity exception apply here (*see* Pl.'s Opp'n at 11); therefore, any such argument is waived, and the Court need not, and does not, address those alternative bases for establishing that the conduct in question fits the commercial-activity exception. For what it's worth, all three clauses of the commercial-activity exception involve similar assessments, and nothing about the second or third clauses indicates that CapitalKeys would be any more successful in attempting to demonstrate that its legal claims are either "based upon . . . an act performed in the United States in connection with a commercial activity of the foreign state elsewhere[,]" or are "based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]" 28 U.S.C. § 1605(a)(2); *see also Kettey*, 53 F. Supp. 3d at 50 ("In order to have subject matter jurisdiction under clause two, the Court must find (1) the plaintiff's action is based upon an act performed in the United States, and (2) that it was taken in connection with a commercial activity of the defendants."); *Valambhia v. United Republic of Tanz.*, 964 F.3d 1135, 1139 (D.C. Cir. 2020) ("Clause three requires a plaintiff to show that her lawsuit is (1) based . . . upon an act outside the territory of the United States; (2) that was taken in connection with a commercial activity of [a foreign government] outside this country; and (3) that cause[d] a direct effect in the United States." (internal quotation marks and citation omitted)).

42

*Co. KG Litig.*, 590 F. Supp. 2d 94, 101 (D.D.C. 2008), and CapitalKeys has not come close to demonstrating that such discovery is warranted.  It is clear beyond cavil that "[a] plaintiff may not use jurisdictional discovery to conduct a fishing expedition in the hopes of discovering some basis of jurisdiction," *Trump v. Comm. on Ways & Means*, 415 F. Supp. 3d 98, 112 (D.D.C. 2019) (internal quotation marks and citations omitted), and it is also well established that a plaintiff seeking jurisdictional discovery "must make a detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce[,]" *id.* (internal quotation marks and citations omitted). Yet, CapitalKeys has made no attempt to describe any specific information bearing on Governor Masangu's authority that it believes exists; instead, it apparently seeks *any* information that could possibly support its theory that Governor Masangu possessed authority to bind the Central Bank to the Retainer Agreement.  "Such generalized predictions are not enough to justify jurisdictional discovery."  *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 53 (D.D.C. 2003).

Moreover, jurisdictional discovery is seemingly unnecessary here, because any evidence that could possibly cure the factual deficiencies this Court has identified above would be in the possession of *CapitalKeys*, not the Central Bank.  *See Agrocomplect*, 524 F. Supp. 2d at 34 n.17 (explaining that "the discretion of a district court to allow jurisdictional discovery in FSIA cases" is generally "limited to those instances where the facts sought are peculiarly within the knowledge of the party against whom discovery is sought" (internal quotation marks and citation omitted)).  As to waiver authority, for instance, CapitalKeys must already be aware of any manifestations made by the Central Bank to CapitalKeys concerning Governor

Masangu's authority to enter into the Retainer Agreement.  And, with respect to the commercial-activity exception, CapitalKeys surely does not need discovery from the Central Bank to be able to prove that CapitalKeys performed its obligations under the contract in the United States.  Thus, this Court sees no basis for subjecting the Central Bank to any discovery before dismissing CapitalKeys's complaint.

CapitalKeys's preclusion argument fares no better.  In this regard, CapitalKeys repeatedly suggests that this Court's prior determination that it had subject-matter jurisdiction at the default-judgment stage, *see CapitalKeys*, 278 F. Supp. 3d at 282–83, is somehow preclusive of the jurisdictional objections that the Central Bank now raises in its motion to dismiss.  (*See, e.g.*, Pl.'s Opp'n at 9 (asserting that this Court's adoption of the magistrate judge's conclusions regarding jurisdiction "means that CapitalKeys met its burden to establish jurisdiction under the FSIA").)  This Court emphatically rejects this contention for several reasons.  First of all, this argument ignores the fact that this Court has now set aside the default judgment (*see* Order Setting Aside Default J. at 1), and a vacated judgment has no preclusive effect, *see United States v. Sci. Applications Int'l Corp.*, 958 F. Supp. 2d 53, 70 (D.D.C. 2013) ("Vacated judgments are not law of the case.").  Furthermore, with respect to subject-matter jurisdiction in particular, it is well established that a court "must dismiss the action" if it "determines *at any time* that it lacks subject-matter jurisdiction," Fed. R. Civ. P. 12(h)(3) (emphasis added), which means that "there is no such thing as law of the case when it comes to subject-matter jurisdiction," *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 79 n.2 (D.D.C. 2013) (rejecting plaintiff's argument that, "by ordering the entry of default against Defendants, this Court has recognized its

jurisdictional powers over Defendants and, thus, had essentially conceded that subject matter jurisdiction exists" (internal quotation marks and citation omitted)), *aff'd*, 782 F.3d 9 (D.C. Cir. 2015); *see also Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004) (explaining that a district court's resolution of factual disputes bearing on subject-matter jurisdiction "is not a conclusive determination but is instead subject to change in light of further development of the facts" (internal quotation marks and citation omitted)).  And, even so, the Court's prior conclusion was reached in the context of default-judgment proceedings, which lack "the full benefits of adversarial litigation[.]"  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58 (D.D.C. 2010).  Courts are loathe to bind themselves and the previously defaulted party to determinations made in the course of entering a default judgment, as a practical matter, *see Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 20 (D.D.C. 2001) (concluding that "findings of fact made during the course of this type of one-sided hearing should not be given a preclusive effect"), and the instant circumstances present those same concerns.

The bottom line is this: with the benefit of arguments from both sides of this legal action, this Court has now carefully assessed whether the complaint and the accompanying evidence is sufficient to establish that either the FSIA's waiver or commercial-activity exceptions to the Central Bank's sovereign immunity apply, and it has determined, in Parts III.A and III.B, that CapitalKeys has failed to satisfy its burden in this regard.  CapitalKeys has not identified any potential evidence not already in its own possession that would justify jurisdictional discovery.  And with its vacatur of the prior default judgment, the Court is entirely free to revisit the issue of its own subject-

matter jurisdiction under the FSIA based on the arguments that the Central Bank has raised in its motion to dismiss, which were not presented to the Court at the default-judgment stage. Having now considered both parties' arguments and the entire record in this case, the Court is firmly convinced that it lacks subject-matter jurisdiction over CapitalKeys's claims against the Central Bank.

### D. The Court Also Lacks Subject-Matter Jurisdiction With Respect To CapitalKeys's Claims Against The Congo

Finally, even though the Congo has not entered an appearance in this case and thus did not join the Central Bank's motion to dismiss for lack of subject-matter jurisdiction (*see* Def.'s Mot. at 1), this Court's jurisdictional determinations compel the conclusion that CapitalKeys's claims against the Congo must be dismissed as well. This is because subject-matter jurisdiction "involves a court's power to hear a case," and a federal court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006) (internal quotation marks and citation omitted). And when "subject matter jurisdiction is premised on the existence of an exception to foreign sovereign immunity, a district court considering a claim against a foreign state must decide whether an exception to immunity applies 'even if the foreign state does not enter an appearance to assert an immunity defense.'" *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 323 (D.D.C. 2014) (quoting *Verlinden*, 461 U.S. at 493 n.20).

When addressing whether this Court has subject-matter jurisdiction to proceed to consider CapitalKeys's claims against the Congo, the Court first observes that there is no distinction between the claims that CapitalKeys brings against the two defendants: the firm seeks monetary damages against both defendants for the alleged breach of the

Retainer Agreement (*see* Compl., Relief Requested), and maintains that both defendants have either waived their sovereign immunity or that the legal claims are based on commercial activity by the foreign state that has taken place inside the United States (*see id.* ¶ 9).  The Court has already explained why neither of these FSIA exceptions apply to divest the Central Bank of its sovereign immunity under the circumstances presented in this case.  *See supra* Parts III.A–B.  And the Court is even more certain that the Congo retains sovereign immunity vis-à-vis the claims that CapitalKeys has brought for the very simple reason that *the Congo is not a party to the Retainer Agreement*, and thus cannot possibly be considered to have waived its immunity or have performed any commercial acts under that agreement for FSIA purposes.

In essence, as it pertains to the Congo, the Court's analysis begins, and ends, with an examination of the contract's terms.  In the very first sentence, CapitalKeys states plainly that "[w]e are pleased that *the Central Bank* is retaining CapitalKeys . . . to provide services on its behalf."  (App. A at A-1 (emphasis added).)  Similarly, the Retainer Agreement is addressed solely to "the Governer [sic] of the Central Bank of Congo" (*id.*), and, throughout the text, the contract references the promised performances by and for a singular "Client": the Central Bank.  And nothing in the agreement even remotely suggests that the Congo itself is a party, nor has CapitalKeys pointed to anything in Act No. 005/2002, or any other provision of Congolese law, that authorizes the Governor of the Central Bank to bind the Congo to contracts or to waive the Congo's sovereign immunity.  Again, the Retainer Agreement is the sole alleged basis for CapitalKeys's contention that this Court has jurisdiction; there is no other basis in the briefs or the record for concluding that the Congo otherwise waived its

sovereign immunity, or has otherwise engaged in any authorized commercial activity that injured CapitalKeys.

CapitalKeys's bald assertion that "representatives from the Congo" (who are largely unnamed and unidentified) told the firm that the Retainer Agreement was properly authorized by Congolese officials (Falkoff Decl. ¶ 4) is entirely implausible. One would reasonably expect a foreign state's willingness to be bound by a multimillion-dollar, multi-year service agreement for the restructuring of its economic infrastructure to be memorialized in writing. No representative of the Congo signed the Retainer Agreement. Moreover, outside of the testimony of CapitalKeys's president, there is no evidence that the Congo even *knew* about the $16 million contract that Governor Masangu was signing on the eve of his departure from the Central Bank. CapitalKeys's assertion that the firm "would not have entered into the Retainer Agreement if representatives from the Congo . . . had not represented that the Congo would be bound by the agreement in addition to [the] Central Bank" (*id.* ¶ 5) is similarly irrelevant, because CapitalKeys had every opportunity to clarify in writing who was to be bound by the contract when it drafted the agreement, and, other than CapitalKeys, the agreement as written binds one and only one other entity: the Central Bank.

Falkoff's averments that "the Central Bank is dependent on and dominated by the [Congolese] government" (Falkoff Decl. ¶ 5), and that he "understood that CapitalKeys' obligations under the agreement would be performed under the control and at the direction of [the Congo]" (*id.* ¶ 4)—even if true—are also patently insufficient to bind the Congo to the Retainer Agreement (as is necessary to bring that defendant into the

plausible orbit of that contract's terms or provisions).  As far as sovereign immunity is concerned, there is a rebuttable presumption of separateness between a foreign state and its instrumentalities.  *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 440 (D.C. Cir. 1990).  And CapitalKeys has done nothing to show that the Central Bank is "so extensively controlled by its owner that a relationship of principal and agent [was] created[.]"  *Transamerica*, 200 F.3d at 848 (internal quotation marks and citation omitted); *see also Foremost-McKesson*, 905 F.2d at 448 (observing that, where "conclusory allegations" regarding control "are challenged by the sovereign, the plaintiff must provide further proof of government involvement in order to overcome the presumption of juridical separateness").  Moreover, and in any event, the purported (oral) representations of Congolese officials to Falkoff concerning Governor Masangu's authority to bind the Congo to the Retainer Agreement would, at most, establish *apparent* authority, which is insufficient to waive a sovereign's immunity for FSIA purposes.  *See supra* Part III.A; *see also SACE*, 243 F. Supp. 3d at 38.[20]

In the final analysis, then, this Court finds that the record evidence comes nowhere close to establishing that Governor Masangu was authorized to enter into the Retainer Agreement on behalf of the Congo, and that finding speaks conclusively to the inapplicability of both the waiver and commercial-activity exceptions for purposes of CapitalKeys's claims against that foreign state.  That is, in the absence of proof that the Congo itself entered into the Retainer Agreement with CapitalKeys, *none* of the terms

---

[20] Truth be told, CapitalKeys's evidence misses the mark on demonstrating even apparent authority, because nothing in Falkoff's declaration or testimony indicates that it was reasonable for CapitalKeys to rely on any oral representations concerning the extent to which the Congo would be bound, given the plain terms of the agreement, which contradict any notion that Governor Masangu was entering into the contract on behalf of the Congo as well as the Central Bank.

of that agreement—including its choice-of-law provision and the terms that relate to the scope and circumstances of the parties' respective performances—can possibly have any bearing on this Court's consideration of whether the Congo retains its sovereign immunity.  And because CapitalKeys has offered nothing else, the Court easily finds that no exception to the FSIA applies with respect to the instant claims against the Congo, and, therefore, the Court lacks subject-matter jurisdiction over the claims that CapitalKeys has brought against the Congo, such that those claims must be dismissed. *See Mwani v. bin Laden*, 417 F.3d 1, 15 (D.C. Cir. 2005).

## IV.    CONCLUSION

CapitalKeys has filed the instant action against a foreign state, claiming that an outgoing official bound the foreign government to a multimillion-dollar services contract with the lobbying firm.  Setting aside the exceedingly strange circumstances of a six-page Retainer Agreement that is devoid of any detail concerning CapitalKeys's actual services and that requires the foreign entity to make an upfront payment of the entire fee for five years' worth of performance, this Court must evaluate whether there is subject-matter jurisdiction to consider CapitalKeys's claims concerning Defendants' alleged breach of the agreement, as a threshold matter.

Now that the Central Bank has appeared in its own defense (after an initial default) and has presented persuasive arguments concerning its right to sovereign immunity under the FSIA, it is clear to this Court that not only did the agent who signed the Retainer Agreement ostensibly on behalf of the Central Bank lack actual authority to do so, but CapitalKeys also did not actually perform any services for the benefit of the Central Bank and the Congo pursuant to the commercial contract inside the United

50

States, as would be necessary to conclude that either the waiver exception or the commercial-activity exception to a foreign state's sovereign immunity applies. Therefore, this Court lacks subject-matter jurisdiction over the claims that CapitalKeys has brought against the Central Bank in the context of the instant lawsuit, which means that the Central Bank's motion to dismiss (ECF No. 63) must be **GRANTED**.  The Court further concludes *sua sponte*, for the reasons explained herein, that there is likewise no subject-matter jurisdiction with respect to CapitalKeys's claims against the Congo.  Accordingly, as set forth in the accompanying Order, CapitalKeys's entire complaint will also be **DISMISSED WITHOUT PREJUDICE**.  *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1253 (D.C. Cir. 2020) (explaining that "a dismissal for want of subject-matter jurisdiction can only be without prejudice").


DATE:  June 3, 2021                          *Ketanji Brown Jackson*
                                             KETANJI BROWN JACKSON
                                             United States District Judge

**<u>APPENDIX A</u>**



April 18, 2013                                        <span style="color:red">CONFIDENTIAL</span>


To the Governer of the Central Bank of Congo
Boulevard Colonnel Tshatshi, Commune de la Gombe,
Ville de Kinshasa
Democratic Republic of Congo

Dear Governer,

We are pleased that the Central Bank is retaining CapitalKeys ("CK" or the "Firm") to
provide services on its behalf.  The purpose of this letter is to set forth our mutual
understanding as to the terms and conditions of CK's engagement.

CapitalKeys is one of Washington, D.C.'s top public affairs firm with local, state, federal
and international government affairs capabilities. These skills are often coupled with
sales / marketing, financial, and regulatory capabilities.

We impact political and policy making processes through our powerful relationships with
resources overseas and in and around Washington, D.C. – the White House, the
Congress, Regulatory Agencies, the Diplomatic Community, the Leadership of the
Fortune 500, Investment Firms, and the Media.


THE CAPITALKEYS APPROACH

CK was formed to provide a wide range of public affairs activities. Its members and
affiliates are known as some of the most influential and successful lobbyists in
Washington, D.C.  CK was founded on the belief that a successful strategy requires more
than effective lobbying and strong relationships. It requires the full range of public affairs
tools, as well as a creative and effective communications strategy.  CK provides clients
with powerful blunt advice and representation with both public and private entities.

Our approach – one of using the entire range of tools necessary for affecting the public
policy and economic process – has proven highly effective in shaping perceptions,

developing allies, turning adverse circumstances into positive outcomes, and most importantly, producing exceptional results for our clients. We create an "echo chamber" in and around Washington, DC for our clients. CapitalKeys is results driven and we take pride in helping our clients achieve success.

One of the keys to being successful in Washington is the ability to put the right information into the right hands at the right time. As a trusted and respected source of information, CapitalKeys has proven these critical abilities time after time.

CapitalKeys is unique among its peers, combining real world McKinsey Consulting training with political experience and a pool of global resources. We look at issues from a business perspective and employ strategies to maximize our client's success.

<u>The Team</u>

Our executive team has been carefully chosen to achieve the perfect balance of skills sets, contacts, and bipartisanship, and successful experiences here and overseas.

Extended biography information can be viewed at www.capitalkeys.com

1.      <u>Description of Services</u>.  CK will provide government relations and strategic communications services to help the Client achieve the following objectives:

- Strengthen the Central Bank's relations, creditability, and integrity with financial institutions, global asset managers, private equity, NGO's, and decision makers in the United States, the European Union, the Middle East, and Asia.

- Assist Central Bank in strategies to reduce inflation and stabilize the currency.

- Advise Central Bank on the creation of a new stock market for a stronger economy.

- Create a more positive image of the Central Bank before the White House, the Department of State, The Federal Reserve and other relevant institutions in the United States.

- Introduce the Governor of the Central Bank to governmental and institutional leaders worldwide as one of the leading forces to restore creditability in the economy and the country of the DRC.

2

- Introduce the Governor of the Central Bank to leading corporations that might benefit from his many years and expertise of successfully guiding monetary policy in a developing nation under the most difficult of conditions.

- Assist the Central Bank to modernize its internal infrastructure.

- Work with the media to redefine the image of the Central Bank and present this redefined good image around the globe.

- Create an "echo chamber" with specific emphasis on agencies such as the World Bank and IMF to raise issues critical to the Central Bank.

- Work with relevant financial, corporate and NGO entities [i.e. The Bill and Melinda Gates Foundation and the Jolie Pitt Foundation], through the Central Bank leadership, with a goal towards direct foreign investment particularly in the areas of clean water, reliant power, mining, education, and healthcare for the people of the DRC.


2.   <u>Additional Services and Benefits</u>

A.   General.   In addition to the effort and work outlined above, we will also supply the following services at no additional cost:

● Ambassadorial / International Relations.

As necessary, we can contact and introduce you, our Client, to high level persons in certain foreign governments and these persons may have relationships with their own financial services and other institutions of help to you.

● Credibility.

Client may find that having the reference of our Firm and our Washington D.C. office presence, in representing Client, will strengthen Client's credibility in dealings and relationships here and abroad. Additionally it may enhance Client's ability to expand its customer base and gain access to additional funding.

3

● Strategy.

Unquestionably, during our discussions, you should have concluded we were quick to find areas of opportunity but more importantly we have coupled our comments and initial review with a strategy addressing concerns.

We intend to continue the process of commenting, and review but also lending to corporate political plans by supplying strategy resulting from many years of domestic and international advising.

● General Relationship Building.

Apart from political and related efforts, there is a significant book of relationships, growing, which we bring to the table.

With CK's assistance, you potentially may find dealing with the CEO, Executive Vice President, etc., of some major companies here and overseas, may result in major deals, solutions, or contracts.

3.  <u>Schedule</u>. Client agrees that this agreement will commence on November 18, 2013 and end on November 17, 2018. Prior to the expiration date of November 17, 2018, Client may elect to extend this agreement by informing the President of CK.

4.  <u>Fee Amount, Expenses and Payment Schedule</u>. Client agrees to pay CK $276,700 per month for professional services (the "Retainer Fees") for a total of $3,320,400 per year which is $16,602,000 for 5 years payable in one payment of $16,602,000 due upon signing.

Failure by Client to pay subsequent professional service and expense fees, if required by this agreement and according to the schedule outlined above, will result in suspension of work by CK for Client.

Payment will be sent by bank wire to:

Account:     CapitalKeys, LLC
Bank:          Wells Fargo Bank
Account #: ███████1106
Routing #:  121000248
Swift Code (if necessary): ██████

4

4. <u>Travel.</u> As we intend to work through our Washington, DC resources and country-based resources on these matters from our Washington, DC offices, we do not expect domestic and/or international travel to arise. However, when additional travel is deemed necessary, only with agreement of the Client, other expenses, including but not limited to items such as first or business class travel, first class hotel accommodations and board, local transportation, printing, translation services, bulk mailing postage and legal fees related to representing Client (e.g., lobbying registration if necessary), and coverage for the time and effort, will be prepaid. All other expenses in excess of USD$50 (fifty U.S. dollars) will require prior approval by Client.

If additional professional services that are not outlined in the scope of work of this Agreement are requested by Client, both parties agree to negotiate in good faith additional fees and expense coverage accordingly.

7. <u>Confidentiality</u>. Except as necessary for the performance of the services contemplated herein, to enforce this Agreement, or as may be required or appropriate in order to comply with all applicable laws, rules and regulations or compulsory legal process, or with the Client's specific consent, CK shall keep confidential all nonpublic information received from Client, its affiliates or representatives. The same shall apply as to information supplied by CK such as strategies and communications relating to high level introductions.

8. <u>Indemnification and Related Matters</u>. Client shall indemnify, defend and hold harmless CK, its owners, principals, and affiliates, from and against all actual or threatened claims, proceedings, suits or investigations of any type, including attorneys' and other professionals' fees and disbursements, arising out of or related to the Client. Client shall advance to each such person such attorneys' and other professionals' fees and disbursements as may be so incurred upon application. Client's obligations under this Section shall survive termination or expiration of this agreement.

**No public release or communication, naming our Firm, by Client may be undertaken without our prior review and approval.**

Regarding communication technology, Client acknowledges that communication by wireless telephone, facsimile transmission, and e-mail poses risks to confidentiality and Client assumes the risks. We cannot guarantee the outcome of our work efforts. We are not responsible for engagement or compensation or terms relating to persons or firm you contract with even those introduced by CK.

None of the terms or provisions of this letter agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by CK and Client or the waiving party. All payments to the Firm are non-refundable and fees are

5

**1615 L Street, NW • 13th Floor • Washington, DC 20036 • (202) 466-1601**

deemed earned upon payment. The Firm will not account for the time or costs or otherwise, of its efforts or payments.

The terms of this agreement are proprietary and confidential and are not to be used for any other purposes.

There are no third party beneficiaries of this Agreement. This Agreement will be governed by the laws of the District of Columbia without regard to principles of conflicts of law and a court in said place shall be the exclusive location for any suit or proceeding relating to this Agreement. This Agreement may be executed in any number of counterparts, including by facsimile, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

Please countersign and return to CK a  copy of this letter, accept this by email,  and or make the initial payment, evidencing Client's agreement to these terms as of the date first written above, being the effective date of our Agreement.


Sincerely,

Adam Falkoff
President, CapitalKeys, LLC
afalkoff@capitalkeys.com
cell: 703-927-2722


**ACCEPTED AND AGREED TO:**

**J.-C. MASANGU MULONGO**

**April 18, 2013**

Client or authorized representative                      Date


6